# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-0106-25
              A-0107-25

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

Q.H. and A.S.,

      Defendants-Appellants,

and

M.J.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF M'S.J.,
K.S., K.S., and K'S.S., minors.

_____

Submitted April 15, 2026 – Decided May 4, 2026

Before Judges Gummer and Paganelli.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FG-02-0009-24.

Jennifer N. Sellitti, Public Defender, attorney for appellant Q.H. (Louis W. Skinner, Designated Counsel, on the briefs).

Jennifer N. Sellitti, Public Defender, attorney for appellant A.S. (Deric Wu, Designated Counsel, on the briefs).

Jennifer Davenport, Attorney General, attorney for respondent (Deborah Wassel, Assistant Attorney General, of counsel; Renee Greenberg, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

In these consolidated matters, defendants Q.H. (Quinn) and A.S. (Arthur) appeal from the Family Part's August 22, 2025 judgment terminating their parental rights to KiS (Kenneth), KaS (Kevin), and KSS (Kate).[1] Quinn also appeals the termination of her parental rights as to MsJ (Matthew). Matthew's biological father is not participating in the appeal. The permanency plan

---

[1] We refer to the parties in this case using initials and pseudonyms to protect their privacy and the confidentiality of these proceedings. R. 1:38-3(d)(12).

A-0106-25

presented by respondent Division of Child Protection and Permanency (Division) for all the children is adoption by their resource parents. The Division and the Law Guardian, on behalf of the children, urge we affirm to allow the adoptions to proceed. Defendants argue the trial court erred in finding the Division had proven by clear and convincing evidence the four prongs of the "best interests" test necessary for the termination of parental rights. See N.J.S.A. 30:4C-15.1(a). Having reviewed the record in light of the parties' contentions and the applicable law, we affirm substantially for the reasons explained by Judge Michael Antoniewicz in his thorough, eighty-five-page written opinion.

The facts and evidence are detailed in Judge Antoniewicz's opinion, which he rendered after an eight-day trial. Accordingly, we only summarize the relevant facts. Quinn and Arthur are the biological parents of Kenneth, Kevin, and Kate, and Quinn is Matthew's biological mother. The Division became involved with Quinn in 2003 and received various referrals concerning her care of the children.

In October 2018, the police contacted the Division regarding the children after they were called to Quinn's home to assist with an eviction. While visiting Quinn's apartment, Division caseworkers observed the children's bedsheets in

3

Quinn's apartment were "soiled and smelled of feces and urine." Further, the caseworkers observed Matthew "appeared sick" and "dirty." There were concerns the children were being left home alone. The children were removed, and Matthew was placed, for the first time, with his current resource parent in July 2019.

In December 2019, Kenneth was born but not removed from Quinn's custody because she was residing with Arthur and the Division had no concerns regarding Arthur's ability to provide care. In March 2020, while Quinn was progressing in therapy and attending visits with her children, the Division terminated the pending guardianship (FG) litigation regarding Matthew. In December 2020, Kevin was born, and the Division did not remove him because Quinn continued to progress. In April 2021, Quinn was reunited with Matthew, and in July the Division terminated the abuse and neglect (FN) litigation. In December 2021, Kate was born.

On February 17, 2022, Quinn, Arthur, and another adult were involved in a traffic stop. After a search of the vehicle, the police found guns and drugs, and Arthur was arrested for "weapon offenses and possession of cocaine, crack[,] and ecstasy." The Division opened an investigation following Arthur's arrest. During the investigation, Quinn "denied any knowledge of any drugs or

4

weapons in the home or in the car." However, Arthur "acknowledge[d] . . . cocaine and ecstasy use."

At the time of Arthur's arrest, the Division's Conflict Unit and the Department of Homeland Security had been concurrently investigating him regarding allegations of human trafficking. The Division implemented a safety protection plan (SPP). Under the SPP's terms, Arthur was required to "[l]eave[] the residence" and "not have contact with the child[ren]." Arthur "reported he w[ould] not have any contact with" the children, would live at a different address, and would submit to a substance abuse evaluation.

In October 2022, Division caseworkers and police officers visited Quinn's residence in East Orange. Quinn "tried to delay [their] entry into the home and insisted that it was just her in the home along with her aunt and her children." After entering the home, police officers found Arthur hiding in a closet. On inspecting the home, the Division determined Quinn had been living there with the children. The Division also observed the younger children had "soiled diapers." According to Arthur, Quinn "got[] the East Orange apartment so that

A-0106-25

they could hide, [because] . . . they were still in a relationship."  The Division conducted an emergency DODD[2] removal of all the children.

The Division assessed Arthur's sister as a potential placement for his children.  However, after several meetings, there were significant obstacles to the children's placement with her including:  her history with the Division regarding her own children, sleeping arrangements, and a live-in boyfriend with a criminal record.  Ultimately, the sister withdrew from consideration.  Those children were placed with their current resource parents as of October 2022, and Matthew was again placed with his former resource parent.

The Division referred Quinn and Arthur to various assessments and services to reunify them with the children.  However, they either failed to submit to the assessments or failed to comply with the recommended services.  Quinn and Arthur failed to comply with the Division's visitation services or maintain contact with the Division.  In January 2024, the Division filed an FG complaint.

The guardianship trial took place between July 2024 and March 2025.  The Division called four witnesses:  its caseworkers, Christine Giordano, Brianne

---

[2] "A 'Dodd removal' refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82."  N.J. Div. of Youth & Fam. Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010) (italicization omitted).

Niego, and Shamaine Campbell; and Frank J. Dyer, Ph.D., who was stipulated "as an expert witness in psychology, parental fitness[,] and bonding." The Law Guardian called three witnesses: Alison Strasser-Winston, Ph.D., who was stipulated as an expert in "psychology, bonding[,] and parental fitness," and two of the children's resource parents. Quinn called Kenneth Schulman, Ph.D., who was stipulated "as an expert in psychology, parenting[,] and parental fitness." Her attorney also provided a statement on her behalf, after she waived her right to testify and without objection by the other parties. The statement was not considered testimony. Arthur called his sister.

The judge found all of the witnesses to be credible, except for Arthur's sister. The sister's testimony focused mainly on the Division's consideration of her as a resource parent for Arthur's children. The judge found her testimony was not credible because: she had a "significant interest in this matter" as Arthur was her family member, and she was close to Arthur's children; it was "confusing and directly contradicted by the Division caseworker who th[e judge] found to be credible and unbiased"; it was "not . . . reasonable and believable in light of the other evidence presented," including "reference to the male residing in her home"; "she answered all questions with some hesitation"; she was

7

"reluctan[t] to answer" and "demonstrated . . . hostility to the Division"; and it "was inherently not believable."

The termination of parents' rights to raise their children is a matter of constitutional magnitude. See In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). Those rights, however, are "not absolute" and are limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 447 (2012).

"Children have their own rights, including the right to a permanent, safe and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). Our courts have acknowledged "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." Ibid. Thus, a parent's interest must, at times, yield to the State's obligation to protect children from harm. See N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009).

Consequently, the law requires a balancing of those two competing interests: the parents' constitutionally protected right to raise their children,

absent state interference, and the State's responsibility to protect the welfare of children. See N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 4, 20 (2023). That balancing "is achieved through the best interests of the child standard." Ibid. (quoting K.H.O., 161 N.J. at 347). "The Legislature has long mandated that in order for a Family Part judge to terminate parental rights, the [Division] . . . must prove by clear and convincing evidence all four prongs of the 'best interests' test set forth in N.J.S.A. 30:4C-15.1(a)." Id. at 7-8.

Under N.J.S.A. 30:4C-15.1(a),

> The [D]ivision shall initiate a petition to terminate parental rights [(TPR)] on the grounds of the "best interests of the child" . . . if the following standards are met:
>
> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

These four prongs "are not discrete and separate" but rather "overlap to offer a full picture of the child's best interests." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 554 (2014). Indeed, "[t]he first two prongs [of the best-interests test], N.J.S.A. 30:4C-15.1(a)(1) and (2), are 'the two components of the harm requirement' and 'are related to one another.'" N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 380 (App. Div. 2018) (quoting In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999)). "Therefore, 'evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child.'" Ibid. (quoting D.M.H., 161 N.J. at 379).

We give substantial deference "to the trial court's credibility determinations." R.G., 217 N.J. at 552. The trial court "has the opportunity to make first-hand credibility determinations about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)). Our deference is also informed by the Family Part's "special expertise in matters related to the family." F.M., 211 N.J. at 448. Accordingly, we defer to the trial court's factual findings "and uphold those findings if they

are grounded in substantial and credible evidence in the record." D.C.A., 256 N.J. at 19. The trial court's decision should be reversed on appeal only if its findings were "so wholly unsupportable as to result in a denial of justice." N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)); see also N.J. Div. of Child Prot. & Permanency v. D.A., 477 N.J. Super. 63, 80 (App. Div. 2023). We review the trial court's legal conclusions de novo. R.G., 217 N.J. at 552-53; see also D.C.A., 256 N.J. at 19 (acknowledging we give no deference to the trial court's interpretation of N.J.S.A. 30:4C-15.1(a)).

Guided by those principles, we consider defendants' challenges to the court's findings under each prong of the best-interests test.

Prong One

Under the first prong, "the Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Dep't of Child. & Fams. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352). The Division need not "wait 'until a child is actually irreparably impaired by parental inattention or neglect.'" F.M., 211 N.J. at 449 (quoting D.M.H., 161 N.J. at 383).

11

In considering prong one, Judge Antoniewicz found the "parents would endanger the safety, health[,] and development of their children." Regarding Quinn, the judge found she "was refusing to cooperate with the Division despite there being serious concerns for the safety of her children." The judge found Quinn "harmed the children by failing to adequately supervise them and meet their needs including the needs of the children medically, educationally[,] and emotionally while the children were in her care." Further, the judge found "[t]he Division ha[d] proven that Q[uinn] needed to participate in and complete various recommended service programs, including [s]ubstance [a]buse [e]valuations." However, she "refused to cooperate with the Division to address [her] issues." Moreover, the judge stated Quinn's "expert . . . Dr. Schulman confirmed that [she] was not in a position to properly care for her children at the present time."

Regarding Arthur, the judge found he "was facing criminal charges for possession of a weapon and drug charges and he was under investigation" for human trafficking. Moreover, the judge found Arthur had "tested positive for cannabinoids, methamphetamines[,] and alcohol metabolites" and "failed to engage in any type of treatment for his substance abuse issues."

In addition, the judge found the "the Division and Q[uinn] and A[rthur] agreed upon a [SPP] which barred A[rthur] from being in Q[uinn]'s home with

A-0106-25

the children." Nevertheless, "[t]he evidence . . . show[ed] that A[rthur] was in the home the day the children were removed." The judge found Quinn had "shown a clear and consistent pattern of neglecting her children's needs and further failing to ensure the children's safety." Further, Arthur "was com[]plicit in Q[uinn]'s neglect," "was fully aware" and "agreed" that the SPP prohibited his presence in the home with the children and "blatantly violated those terms."

The judge concluded "based on the credible testimony by caseworkers Niegro, Campbell[,] and Giordano and the expert witnesses Dr. Dyer, . . . and Dr. Winston, . . . as well as the compelling documentary evidence . . . that there [wa]s clear and compelling evidence of harm to the children based on the parental child relationships." The judge stated importantly, Dr. Dyer and Dr. Winston provided "compelling and credible testimony" "that future exposure of these children to Q[uinn] and A[rthur] will continue to pose harm to the children."

Quinn contends the judge erred under prong one because the judge "found that [she] harmed the children based on her alleged refusal to cooperate with the [Division] and alleged unfitness, rather than any actual harm imposed upon the children." She argues the judge based his decision "upon . . . mere speculation." Further, she denies violating the SPP and contends she "consistently maintained

13

that A[rthur] broke into her home without her knowledge or permission" and she changed the locks after Arthur broke through the back door.

We conclude there is no merit in Quinn's arguments. She overlooks her refusal to cooperate and submit to recommended services, including substance abuse evaluations. Moreover, regarding the violation of the SPP, the judge found: Arthur "reported that he had come home four hours ago and was sleeping on the floor"; Quinn "asked A[rthur] to pick up the computer, but . . . did not know he was coming over then"; and she "subsequently told the Division caseworker that her aunt had opened the door for A[rthur] to give him her computer." Applying our deferential standard of review, we conclude there is no basis to disturb the judge's factual findings. Moreover, we are satisfied the judge correctly applied the first prong and concluded the Division established the first prong by clear and convincing evidence as to Quinn.

Arthur argues his children were not harmed or endangered by his criminal charges, human trafficking investigation, or positive drug test. We are not convinced. Under these facts, there is no error in the judge's conclusion that the children's "safety, health, or development" was endangered. In addition, the judge found Arthur "tested positive for cannabinoids, methamphetamines[,] and alcohol metabolites" and "failed to engage in any type of treatment for his

A-0106-25

substance abuse issues." Again, these factual findings support the judge's conclusion the children were endangered.

Lastly, Arthur does not address his violation of the SPP, which was implemented to bar him from Quinn's residence when the children were present. Certainly, a violation of the SPP endangered the children. We conclude there was no error in the judge's application of prong one as to Arthur and are convinced the Division established the prong by clear and convincing evidence as to him.

Prong Two

Under prong two, "the inquiry centers on whether the parent is able to remove the danger facing the child." F.M., 211 N.J. at 451 (citing K.H.O., 161 N.J. at 352); see also D.C.A., 256 N.J. at 27 (finding prong two as amended was intended "to ensure that parental fitness -- not the child's bond with resource parents -- is the core inquiry when a judge considers the best[-]interests standard's second prong in a termination of parental rights case").

In considering prong two, Judge Antoniewicz "found [the] parents were and are unable and/or unwilling to eliminate the harm to these children." Regarding Quinn, the judge relied on Dr. Dyer's testimony and found Quinn "failed and refused to take responsibility for her actions" and "refused to comply

with the necessary evaluations nor engage in recommended services." The judge found Quinn was "unable and/or unwilling to provide these children with a safe and stable home." Moreover, based on the expert's testimony, the judge determined Quinn "was not a viable candidate for the custody of" the children and would not be an adequate parent "within the foreseeable future."

In addition, the judge relied on the testimony of Dr. Winston. The judge noted "Dr. Winston testified that Q[uinn] presented with multiple factors that would impair her ability to properly parent her children," including making "no progress in addressing her parenting issues" and having "no insight into how her negligent behavior and poor judg[]ment placed her children at risk for harm." The judge found credible Dr. Winston's "conclusion that Q[uinn] was not able to provide a safe and stable environment for her children now or in the foreseeable future."

Moreover, Judge Antoniewicz noted Quinn's "own expert witness," Dr. Schulman, had testified that Quinn was not presently "capable of resuming custody of her children." The judge stated Dr. Schulman had testified Quinn "had not achieved all that she needed in order to be able to safely care for her children." Further, the judge noted Dr. Schulman had found Quinn "made some

16

A-0106-25

progress," but he could not state she would continue to progress or "how long it would take, if at all, for Q[uinn] to be able to safely parent her children."

Regarding Arthur, the judge found he had "refused to comply with the necessary psychological evaluations in order to determine what specific services [we]re needed for him" and had "failed to attend any substance abuse programs and failed to maintain steady and consistent housing."

The judge stated Dr. Dyer had testified that Arthur "was not a viable candidate for custody of" his children because Arthur failed to address his substance abuse issues. The judge also noted Dr. Dyer had testified that Arthur "appeared to lack a value system that supports safe and appropriate parenting of a child." Further, "Dr. Dyer . . . did not believe that A[rthur]'s arrests for weapons and drugs w[ere] compatible with providing a stable, nurturing[,] and protective lifestyle for his three children." The judge found credible "Dr. Dyer's . . . opinion that A[rthur] would not be able to achieve adequate parenting capacity within the foreseeable future."

Moreover, the judge noted Dr. Winston opined that Arthur "was not capable of safely parenting his children." Dr. Winston testified Arthur "had multiple issues that would impair his ability to safely parent his children" including: "poor judgment and questionable decision-making skills"; "illicit

17

A-0106-25

substance use" and failure "to attend substance abuse treatment or to address the factors underlying his substance dependence"; and "minimal visitation with his children." The judge noted "Dr. Winston's conclusion that A[rthur] was not able to provide a safe and stable environment for his children now or in the foreseeable future."

Judge Antoniewicz considered whether "the delay of permanent placement will add to the harm" to the children, N.J.S.A. 30:4C-15.1(a)(2), and found further delay would add to their harm. The judge acknowledged there is a "strong public policy in favor of permanency," (quoting N.J. Div. of Youth and Fam. Servs. v. P.P., 180 N.J. 494, 510-511 (2004)); see also K.H.O., 161 N.J. at 357. Further, the judge stated children cannot be kept in "limbo, hoping for [a] long-term unification plan," (quoting N.J. Div. of Youth and Fam. Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001)). The judge concluded the Division had "proven the second prong of N.J.S.A. 30:4C-15.l by clear and convincing evidence."

Quinn contends the judge erred in his application of the second prong because she "explained" that her "refus[al] to comply with certain evaluations or engage in some recommended services" was a result of having "completed such services in prior litigation years ago." She argues the judge "ignore[d] the

18

substantial evidence of [her] progress and compliance throughout the current litigation." Quinn claims that "on her own initiative, [she] completed a parenting class" and "engaged in individual therapy." Quinn concedes Dr. Schulman's opinion that she "was not presently capable of resuming custody at the time of his evaluation," but she argues "she had made progress and may continue to do so."

We conclude there is no merit in Quinn's arguments. The arguments ignore her refusal to cooperate and submit to recommended services, including substance abuse evaluations. Moreover, her reliance on the completion of prior services is misplaced in the current litigation. Every expert—Dr. Dyer, Dr. Winston, and Dr. Shulman—opined she is not ready to parent. We add Quinn also does not address the children's need for permanency. However, there is no reason to disturb the judge's determination that the delay in the children's permanency will add to their harm. We are satisfied the judge correctly applied the second prong and concluded the Division established the prong by clear and convincing evidence as to Quinn.

Arthur does not meaningfully assert an argument under prong two. We add the judge's finding that Arthur's refusal to address his substance abuse issues and failure to visit with his children evidence, clearly and convincingly, that he

is unwilling or unable to eliminate the harm facing his children or provide a safe and stable home. Further, the children are entitled to permanency, and the judge's conclusion that the delay adds to their harm is supported by credible expert testimony.

Prong Three

N.J.S.A. 30:4C-15.1(a)(3) requires the Division to make "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home" and the court to "consider[] alternatives to termination of parental rights[.]" As to the first part of prong three, the reasonableness of the Division's efforts is not conditioned on their success. N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 488 (App. Div. 2012). The success or failure of the Division's efforts will "not foreclose a finding that the Division met its statutory burden to try to reunify the children with the family." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super. 576, 620 (App. Div. 2007)). "Experience tells us that even [the Division]'s best efforts may not be sufficient to salvage a parental relationship." F.M., 211 N.J. at 452. As to the second part of the third prong, the Division must "prove by clear and convincing evidence that 'alternatives to termination of parental rights' have been appropriately considered." N.J. Div.

of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 87 (App. Div. 2013) (quoting N.J.S.A. 30:4C-15.1(a)(3)).

Under N.J.S.A. 30:4C-15.1(c),

> "reasonable efforts" mean attempts by an agency authorized by the [D]ivision to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure, including, but not limited to:
>
> > (1) consultation and cooperation with the parent in developing a plan for appropriate services;
> >
> > (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
> >
> > (3) informing the parent at appropriate intervals of the child's progress, development, and health; and
> >
> > (4) facilitating appropriate visitation.

Judge Antoniewicz found "the Division caseworkers . . . testified in a credible manner that the Division made extensive and reasonable efforts including consultation and cooperation with the parents." The judge noted the Division caseworkers testified regarding numerous services offered to Quinn and Arthur.

21

The judge found Quinn was provided with: "appropriate therapy, assist[ance] with housing, transportation," parenting referrals and "multiple variations of parent-child visitation." However, the judge found Quinn had "demonstrated a consistent inability to properly participate in visitation," such as cancelling and appearing late for visits, which ultimately led CarePlus to terminate the service. The judge also found Quinn had been provided with visitation at Division offices and at Arthur's sister's home.

In addition, the judge found "the Division attempted to provide substance abuse evaluations [and] substance abuse treatment," but Quinn "refused to comply with these services." Moreover, the judge found the Division provided Quinn with a Center for Evaluation and Counseling, Inc. (CEC) psychological evaluation, but she had "refused to accept the Division's assistance in finding a therapist who would provide her with an appropriate level of care."

With respect to Arthur, the judge found the Division provided him with two substance abuse evaluations, but he had refused to allow the Division to refer him to an appropriate program or assist him to engage in recommended services. Further, the judge found Arthur had failed to attend a psychological evaluation at CEC. Moreover, the judge found the Division referred Arthur for

22

A-0106-25

visitation at CarePlus, but Arthur had refused to "set up" visits and had failed to attend "weekly Division supervised visits . . . at the Division office."

The judge concluded "the Division has clearly and convincingly shown that it has provided reasonable efforts to assist . . . [the] parents to correct and overcome those circumstances that necessitated the placement of the children and in reunifying the family structure."

Judge Antoniewicz stated he "considered alternatives to the termination of parental rights." However, he found "[t]he evidence presented . . . clearly supports the fact that reunification of these children with [either] parent is not in the children's best interests, nor in the foreseeable future." The judge noted "[n]umerous relatives were explored and ultimately ruled out as placement options for the children." The judge found Arthur's "sister was fully vetted, and the Division worked tirelessly to overcome issues presented by the placement in her home." However, ultimately, the "sister withdrew her name from consideration for placement."

The judge recounted the testimony of one of the proposed adoptive resource parents for Kenneth, Kevin, and Kate and noted she understood the differences between TPR and kinship legal guardianship (KLG), she was "not willing to enter into a" KLG, and she and her husband were "only interested in"

23

adoption. In addition, the judge considered the testimony of Matthew's proposed adoptive resource parent and noted he understood the differences between TPR and KLG, was "not willing to enter into a" KLG, and "was clear that he and his husband are only interested in" adoption. The judge found the current resource parents "wish to adopt all of the children" and they "provide the children with a warm, loving[,] and supportive environment." The judge stated Dr. Dyer credibly explained KLG was not "appropriate in this case" because "it was clear that the on-going parent-child relationship was causing harm to these children."

The judge concluded "that the Division made more than reasonable efforts to provide services . . . and that there are no alternatives to the termination of parental rights." Thus, the judge found "the Division has proven the third prong of the best interest[s] standard by clear and convincing evidence."

Quinn contends the judge erred in concluding the Division had provided reasonable efforts because the "efforts were neither reasonable nor designed to facilitate reunification." She argues the Division "repeatedly failed to accommodate her work schedule when scheduling appointments and visitation." Further, she "objected" to the CEC's recommendation for "alcoholism aftercare and random urine screens for valid reasons" because she "successfully completed substance abuse treatment . . . and tested negatively for alcohol and

24

substances . . . in the prior litigation" and "[t]here were no positive screens for alcohol and no allegations that Quinn was drinking alcohol during the current litigation."

We conclude there is no reason to disturb the judge's finding "the Division made extensive and reasonable efforts including consultation and cooperation with the parents." Instead, Quinn decided which services she would comply with and how she would satisfy others. Quinn relies on her completion of some Division services provided in the prior FG and FN litigations, but her completion of those services does not address her failure to complete the services provided to her in this litigation, especially given the expert witnesses' opinions about her inability to parent and care for the children. The judge found the Division provided visitation at CarePlus, including on Sundays, Division offices, and at Arthur's sister's house, until she no longer wanted to host visits. Further, the judge noted Campbell's testimony that Quinn "did not provide proof of her work schedule, which [Quinn] claimed frustrated her ability to visit her children at Care[]Plus. The Division asked for this information and never received it." There is sufficient and credible evidence in the record to support the judge's finding that the Division provided reasonable efforts, including visitation.

25

Quinn's attempt to blame the Division for her inadequate compliance is belied by the record.

Quinn also contends the judge erred in determining there were "no viable alternatives to" TPR because "[t]he [c]ourt's analysis improperly deferred to the resource parents' wishes rather than analyzing whether KLG would serve the children's best interests under the amended statutory framework." We disagree. The judge found "[t]he evidence presented . . . clearly supports the fact that reunification of these children with any parent is not in the children's best interests, nor in the foreseeable future." The judge included in his analysis whether KLG was a viable alternative and, after hearing testimony from the resource parents and Dr. Dyer, concluded it was not.

Arthur argues the Division "may have worked hard to place the children with [his sister, but] its efforts were also unreasonably incompetent and so frustration-inducing as to cause [her] to withdraw from the process." Further, Arthur contends the judge's finding that his sister's testimony was "not credible due to her 'significant interest' as [his] sister, her hesitant style in answering some questions and testimony that was 'directly contradicted by the Division caseworker,'" lacked reference "to any evidence in the record" and was not based

on "specifics." We defer and decline to disturb the judge's factual and credibility findings.

Arthur also argues "the court, not [the Division], has a statutory obligation to consider whether KLG is in the best interests of the children." He contends "there are two pathways to achieve" KLG. Arthur argues KLG could have been effectuated through his sister if the Division "had exerted reasonable efforts to place the children with" her. Additionally, Arthur argues the children's resource parent was a possibility for KLG because she "was open to allowing [him] to visit his children even after termination." Arthur contends the resource parent had no concerns with him, only Quinn.

Applying the deferential standard to the judge's factual findings, we conclude there is no merit to Arthur's KLG arguments. The judge found the sister was not credible and the Division "worked tirelessly" to place Arthur's children with her before she "withdrew her name from consideration for placement." Under these facts, the judge did not err in concluding KLG was not viable with Arthur's sister. The court considered the evidence and determined reunification was not in the children's best interest. Additionally, the court considered the testimony of the resource parents in concluding KLG was not a reasonable alternative to TPR.

27

Prong Four

Prong four, N.J.S.A. 30:4C-15.1(a)(4), "serves as a fail-safe against termination even where the remaining standards have been met." N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 609 (2007). "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with th[e] parent." E.P., 196 N.J. at 108. In making that determination under the fourth prong, the court may consider evidence regarding the bond between the child and the resource parents. See D.C.A., 256 N.J. at 28 (holding the 2021 amendment to N.J.S.A. 30:4C-15.1(a) "precludes a court from considering the bond between a child and resource parents under the second prong of the best[-]interests standard but does not bar such evidence when the court addresses that standard's fourth prong").

In D.C.A., the Court

> noted the importance of expert testimony in that inquiry, observing that
>
>> [t]o determine whether the comparative harm is proscribed by the fourth prong in a case involving a child in foster care, such as K.H.O., the court must inquire into the child's relationship both with her biological parents and her foster parent. "Weighing the potential harm that terminating

28

[the child's] relationship with her mother [might cause] against that which might come from removing her from her foster home is painfully difficult, but it is a decision that necessarily requires expert inquiry specifically directed to the strength of each relationship."

[256 N.J. at 23 (alterations in original) (quoting K.H.O., 161 N.J. at 355).]

"A court should hesitate to terminate parental rights in the absence of a permanent plan that will satisfy the child's needs." N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 593 (App. Div. 1996). Our "courts have recognized that terminating parental rights without any compensating benefit, such as adoption, may do great harm to a child. Such harm may occur when a child is cycled through multiple foster homes after a parent's rights are severed." E.P., 196 N.J. at 109 (citation omitted).

Judge Antoniewicz found "[t]he credible testimony of Dr. Dyer and Dr. Winston was that the on-going parent[-]child relationship between Q[uinn] and A[rthur wa]s causing . . . harm to these children. . . ."

Further, the judge noted Dr. Dyer's testimony that Kenneth, Kate, and Matthew "appeared to have a positive relationship with Q[uinn], however . . .

29

none of these children showed a secure attachment to" her.[3]  In addition, the judge stated Dr. Dyer had noted Kenneth and Kate "showed some positive affection towards" Quinn, however Matthew's "feelings toward [her] were more negative than positive."  The judge found "Dr. Dyer provided credible testimony" that the purported adoptive resource parents were the "children's primary nurturing figures" and "provided the children with safety, security[,] and nurtu[r]ance."  Further, "[i]t was Dr. Dyer's credible opinion that if the relationship between the children and the resource parents was severed, the loss would be severe and []traumatic."  The judge noted Arthur had "failed to attend his scheduled bonding evaluation with [Dr. Dyer] which led [the doctor] to conclude that [he] lacked a genuine investment in parenting his children."

The judge considered Dr. Winston's bonding evaluation of Quinn with all four of the children.  The judge stated, "Dr. Winston testified that there was a positive affectionate bond between Q[uinn] and these children, but that this bond did not rise to a secure emotional attachment."  The judge noted Dr. Winston's opinion that "the children did not see [Quinn] as a primary provider for their needs for affection, nu[r]turance, guidance[,] and protection."

---

[3]  Kevin did not participate in the bonding evaluation with Dr. Dyer due to illness.

A-0106-25

The judge found "Dr. Winston was of the credible opinion that A[rthur]'s children had an insecure emotional attachment to" him. The judge stated "Dr. Winston found that there was a positive emotional attachment between [Arthur and his children], but that [he] struggled to parent his children in an appropriate manner." The judge noted "Dr. Winston characterized the bonding evaluation as 'chaotic' and felt that A[rthur] demonstrated little knowledge of his child[r]en's specif[i]c needs."

The judge considered Dr. Winston's bonding evaluation of Kenneth, Kevin, and Kate with their resource parents. The judge found the resource parents "were able to engage with the children in a more appropriate manner and Dr. Winston saw that the children were more responsive and cooperative with their resource parents." The judge stated "it was Dr. Winston's opinion that [the children] ha[d] developed a strong and secure emotional attachment [t]o the resource parents, . . . with whom they feel secure and loved." The judge noted "Dr. Winston was of the opinion that the children would experience, at most, minimal harm if the parental rights of" Quinn and Arthur were terminated. Further, the judge stated Dr. Winston's and Dr. Dyer's opinions "mirrored" one another.

31

A-0106-25

The judge noted "Dr. Winston testified that M[atthew]'s interactions with his resource parents showed a strong, secure emotional attachment to them." Further, Matthew's "resource fathers were aware and responsive to his physical, emotional[,] and devel[o]pmental needs." The judge noted Dr. Winston's opinion Matthew "would not suffer emotional harm if Q[uinn]'s parental rights were terminated and . . . that it [wa]s in M[atthew]'s best interests to obtain perm[a]nency in the home of his resource fathers."

Judge Antoniewicz found termination of Quinn's and Arthur's parental rights "will not do more harm than good to the children in this case" because "[t]he children do not know any of the biological parents as a reliable parental figure." Further, Quinn and Arthur "are not now nor in the foreseeable future . . . viable candidate[s] to parent these children." The judge found Quinn and Arthur "cannot provide and have failed to provide these children with a safe and stable home which they need to grow and to thrive."

Quinn contends the judge erred in his application of prong four. She argues the judge's "focus should have been on the relationship between [her] and her children and the harm that would result from severing that relationship." Quinn alleges "[t]he evidence establishe[d] that all of the children have positive

A-0106-25

relationships with Quinn that would be permanently destroyed by termination of her parental rights."  Arthur does not make a standalone prong four argument.

We conclude the judge committed no error in applying prong four. Instead, on the basis of expert opinions, the judge found Quinn and the children have a positive relationship but without a secure attachment.  In contrast, the judge found the children have a secure emotional attachment to their resource parents.  Further, the judge found the termination of Quinn's relationship with the children would inflict minimal harm that could be ameliorated by the resource parents.  However, termination of the children's relationship with their resource parents would inflict severe and traumatic harm which neither Quinn nor Arthur could mitigate.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

33                                                                                A-0106-25